**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
AMARILLO DIVISSION**

| | |
|---|---|
| ORGANOGENESIS INC., a corporation, | |
| Plaintiff, | |
| v. | Civil Action No. |
| RUSSELL MELCHER, | |
| Defendant. | |
| | **JURY TRIAL DEMANDED** |

## <u>COMPLAINT</u>

1.    Organogenesis Inc. ("Organogenesis" or the "Company") brings this action to protect its confidential information and trade secrets, enforce its Invention, Non-Disclosure and Non-Competition Agreement (the "Non-Compete Agreement"), recover damages from its recently terminated sales representative, Russell Melcher ("Melcher"), and enjoin further harm caused by Melcher's violations of his contractual and legal duties.

2.    Organogenesis develops, manufactures, and sells regenerative products for advanced wound care and surgical and sports medicine. Organogenesis sells its products across the United States and employs sales representatives in each of its sales territories. The Company relies on its sales representatives to liaise with medical professionals, market its products, and be the face of the Company in their respective territories. To protect its good will and confidential information, including information about its customers, Organogenesis routinely enters into agreements with its sales representatives that prohibit them from, among other things, (1) engaging in business activity that is competitive with the Company while employed at the

1

Company and for a period of time after they leave; (2) soliciting Organogenesis's customers while employed at the Company and for the same period after they leave; and (3) misusing Organogenesis's confidential information, including, without limitation, customer purchase histories and preferences, customer practice patterns, and strategies for gaining business from customers and prospective customers.

3.      Melcher was employed as a sales representative for Organogenesis from August 4, 2014 through January 5, 2024. When he was hired, Melcher agreed to and signed the Non-Compete Agreement, which specifically prohibits him during his employment and for two years thereafter from transacting business with and soliciting business from Organogenesis's customers and engaging in business activities competitive with the Company. The Non-Compete Agreement also prohibits him from misusing Organogenesis's confidential information.

4.      Melcher blatantly violated the Non-Compete Agreement and his fundamental duty of loyalty to Organogenesis for nearly a year (or longer) while he was *still* employed at the Company. Organogenesis caught Melcher "moonlighting" for the Company's direct competitors and soliciting the Company's customers in his sales territory of West Texas, which includes the cities of Lubbock, Amarillo, Midland, Odessa, Abilene, San Angelo, and Big Spring (the "West Texas Territory").

5.      Melcher's duplicitous scheme was exposed when Organogenesis's competitors, Tides Medical and Rogue Medical LLC, and one of its top customers, Dr. Timothy Bumann, copied Melcher's Organogenesis email address on several communications. Those emails reveal that, while a full-time employee of Organogenesis, Melcher deceptively worked as a double agent on behalf of Rogue Medical and Tides Medical. Using a Rogue Medical email address, Melcher worked on behalf of the Company's competitors, solicited some of Organogenesis's top

customers for the benefit of Tides Medical and Rogue Medical, and sold those customers

products that directly compete with Organogenesis's products. Melcher orchestrated this scheme

with two of Organogenesis's former employees, Michelle Lerma of Rogue Medical and John

Jarvis of Tides Medical, since at least January 2023—nearly a year before Organogenesis

discovered his deceit and terminated his employment.

6.      Organogenesis's preliminary investigation of its losses as a result of Melcher's

scheme reveals that Melcher's duplicity, misuse of confidential information, and breach of his

Non-Compete Agreement have cost the company upwards of $5 million in lost profits. Those

losses, however, significantly underestimate the ongoing damage to Organogenesis's business:

Melcher has significantly damaged the company's relationships with the top medical practices

using wound grafts in the West Texas Territory. Those relationships—and the revenues

stemming therefrom—are irreplaceable.

7.      Organogenesis therefore brings this action against Melcher seeking compensatory

and punitive damages, permanent injunctive relief, and attorneys' fees and costs.

## THE PARTIES

8.      Plaintiff Organogenesis Inc. is a Delaware corporation with its principal place of

business in Massachusetts. Organogenesis develops, manufactures, and sells regenerative

products for advanced wound care and surgical and sports medicine. Organogenesis sells its

products across the United States and employs sales representatives in each of its sales

territories. The Company was founded in 1985 and has since grown its portfolio to include

products such as Apligraf, a living cell-based product used to treat diabetic foot ulcers and

venous leg ulcers; PuraPly AM, a line of grafts for chronic and acute wound management; and

Novachor, a fresh allograft wound covering used for the management of acute and chronic wounds.

9.      Defendant Russell Melcher is an individual and a citizen of the State of Texas, residing in Canyon, Texas (within the Northern District of Texas). Defendant Melcher is a recently terminated sales representative for Organogenesis. From August 4, 2014 through January 5, 2024, Melcher was a sales representative for the Company, spending the majority of his time as a Senior Tissue Regeneration Specialist. From August 4, 2014 until his termination, Melcher was responsible for sales of all Organogenesis wound care products in the West Texas Territory, which includes the cities of Lubbock, Amarillo, Midland, Odessa, Abilene, San Angelo, and Big Spring. Defendant Melcher may be served at his home address, 4 Tiffany Lane, Canyon, Texas 79015, or wherever he may be found.

10.     Non-party Rogue Medical LLC ("Rogue Medical") is a limited liability company organized in the State of Oregon. On information and belief, Rogue Medical operates as a sales agency for wound care products, including in the West Texas Territory, and Michelle Lerma, a former Organogenesis sales representative that previously covered another territory in Texas, is the Vice President of Sales for Rogue Medical.

11.     Non-party Tides Medical is a Louisiana-based company that makes advanced skin substitutes, including multiple wound care products. John Jarvis, a former Organogenesis employee, is a Regional Sales Director at Tides Medical.

## JURISDICTION AND VENUE

12.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 because this action seeks to enforce rights and remedies secured under the federal Defend Trade Secrets Act ("DTSA"), 18 U.S.C. § 1836 *et seq*.

13.     This Court also has subject matter jurisdiction pursuant to 28 U.S.C. § 1332 because Plaintiff Organogenesis and Defendant Melcher are citizens of different states and the amount in controversy exceeds $75,000, exclusive of interests and costs.

14.     This Court has personal jurisdiction over Defendant Melcher because he resides in the State of Texas and has sufficient minimum contacts with Texas.

15.     Venue is proper in this Court under 28 U.S.C. § 1391(b)(1) because the Defendant resides in this District. Venue is also proper in this Court under 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to Organogenesis's claims occurred in this District.

## FACTUAL ALLEGATIONS

**Organogenesis's Investments in Product Innovation, Sales Strategies, and Training**

16.     Organogenesis has developed a comprehensive portfolio of advanced wound care products that it markets to clinicians. It provides regenerative medical products that support patients throughout the process of wound healing.

17.     One of the premier brands in Organogenesis's portfolio is its PuraPly product line. PuraPly works as a physical and antimicrobial barrier to help prevent the accumulation of bacteria on a wound and support the healing process. PuraPly comes in a variety of sizes and configurations to manage different wound types and works as an effective barrier to resist microbial colonization within the device and reduce microbes penetrating through the device.

18.     The PuraPly line of products, introduced to the market in 2016, features some of Organogenesis' most significant products, representing approximately half of the Company's net revenue.

5

19.     In addition to the PuraPly line, Organogenesis's wound offerings include three placental derived human tissue allograft products: NuShield, Affinity, and Novachor. These products are produced from placentas donated by birthing mothers from their caesarean procedures.[1]

20.     NuShield is comprised of the amnion, chorion, and spongy layers of the placenta. It is dehydrated and terminally sterilized, and the processing retains native proteins of the tissue, including cytokines, growth factors, and matrix proteins. The product is used as a barrier to support the wound healing process and is intended for use on various types of wounds and anatomical locations.

21.     Affinity is comprised of the amnion layer of the placenta. It is a "fresh" product (not dehydrated or sterilized), retaining tissue elements such as viable cells, cytokines, growth factors, and matrix proteins—thus, preserving as closely as possible the native amniotic membrane. The product is used as a barrier to support the wound healing process and is intended for use on various types of wounds and anatomical locations.

22.     Novachor is comprised of the chorion layer of the placenta. It is a "fresh" product (not dehydrated or sterilized), retaining tissue elements such as viable cells, cytokines, growth factors, and matrix proteins—thus, preserving as closely as possible the native chorion membrane. The product is used as a barrier to support the wound healing process and is intended for use on various types of wounds and anatomical locations.

23.     Apligraf, Organogenesis's bioengineered skin substitute, is comparable in structure to human skin, with dermal and epidermal layers containing living skin cells. The product stimulates wound healing by moving the patient's tissue from a chronic non-healing

---

[1] Organogenesis does not use fetal tissue, stem cells, or any other byproducts of abortion in any of its products.

state to an active healing state.  It is used to promote healing of venous leg ulcers and diabetic foot ulcers.

24.     Organogenesis markets its portfolio of products, including the PuraPly line; placental-based products like NuShield, Affinity, and Novachor; and bioengineered skin substitutes like Apligraf, through territory-based medical sales representatives, who are known as Tissue Regeneration Specialists.

25.     Each Tissue Regeneration Specialist is assigned to a "territory" within a larger "region" of the United States and reports to a Regional Sales Manager. Within their territories, the Tissue Regeneration Specialists serve as Organogenesis's primary points of contact with medical clinicians, customers who purchase Organogenesis's products, and prospective customers.

26.     Organogenesis relies on its Tissue Regeneration Specialists to develop and maintain strong relationships with medical clinicians and customers and to expand its clientele. To that end, the Company invests significant resources in training its Tissue Regeneration Specialists. Training for Tissue Regeneration Specialists typically consists of multiple phases, with each phase incorporating at-home and field training.

27.     Tissue Regeneration Specialists are provided with rigorous home study materials and accompanying assessments that cover topics ranging from the types of conditions that Organogenesis's products treat to key features that differentiate Organogenesis products from other products on the market. Organogenesis also provides training on sales techniques, marketing, reimbursement, and compliance.

28.     Tissue Regeneration Specialists have access to confidential information about Organogenesis's customer accounts and market intelligence, including, for example, customer

preferences, purchase histories and patterns, competitive product utilization, practice patterns (*e.g.*, how clinicians utilize skin substitutes), and purchase power (*e.g.*, credit limits and other limitations).

**Melcher Signs the Non-Compete Agreement as a Condition of His Employment**

29.    One of the conditions of Melcher's offer of employment at Organogenesis was his execution of a Non-Compete Agreement. *See* Ex. 1. Melcher's executed Non-Compete Agreement is incorporated herein by reference.

30.    Pursuant to the Non-Compete Agreement, Melcher made a series of agreements to devote his best efforts toward advancing Organogenesis's interests, not to solicit Organogenesis's customers, and not to use Organogenesis's confidential information for any improper purposes, including personal gain.

31.    Melcher specifically pledged that for the term of his employment and for a period of two years thereafter, he would not participate as a "salesperson or employee of any other business, firm or corporation which is, or by the action of Employee would become, competitive with the Business of the Company." Ex. 1, § 2.

32.    In addition, Melcher also agreed that he would not "attempt to interfere with or entice away any customer, licensee or employee or consultant of the Company." *Id.*

33.    Finally, Melcher pledged not to misuse Organogenesis's confidential information, which includes, without limitation, confidential information relating "to the business of" the Company or any of its customers, as well as "prospect or customer list." *Id.* § 6. The provision governing Melcher's handling of Organogenesis's confidential information provides:

> Without prior written approval or except in connection with his or her specifically assigned duties, Employee agrees not to disclose, publicly or privately, to anyone outside of the Company, or **use directly or indirectly for Employee's own benefit**, during the

8

period of his or her association with the Company, or any time thereafter, any . . . trade secret or confidential report or other confidential information . . . prospect or customer list . . . relating to the Business of the Company o[r] any of its prospects, customers, licensees or suppliers, regardless of how such Confidential Information was acquired or generated, until the same shall be published or otherwise made generally available to the public without restriction.

Ex. 1, § 6. (emphasis added).

34.     In addition to his obligation not to disclose Organogenesis's confidential information, Melcher is not permitted to retain any copies of Organogenesis's confidential information and "[a]ll copies of any such Confidential Information whenever, however and wherever produced, shall be and remain the sole property of the Company." *Id.*

**Melcher's Role at Organogenesis**

35.     Melcher began working for Organogenesis on August 4, 2014. During the entirety of his employment, Melcher received an annual salary and was also eligible to receive incentive bonuses and commission.

36.     Melcher was hired as the Tissue Regeneration Specialist for the West Texas Territory. Melcher was elevated to a Senior Tissue Regeneration Specialist for the same territory in March 2019.

37.     Melcher continued to serve as the sole sales representative for the West Texas Territory until his termination. For over nine years, Melcher was the primary face of Organogenesis in the West Texas Territory.

38.     Melcher marketed Organogenesis's entire line of wound care products, including its PuraPly line, Affinity, NuShield, Apligraf, and Novachor.

39.     Melcher had access to confidential information about Organogenesis's customer accounts and prospective customers in the West Texas Territory and related market intelligence, including, for example, customer preferences, purchase histories and patterns, competitive product utilization, practice patterns (*e.g.*, how clinicians utilize skin substitutes), and purchase power (*e.g.*, credit limits and other limitations).

40.     At Organogenesis, sales representatives within regions (each consisting of multiple territories) frequently discuss their accounts, how to reach prospective customers, and best practices for increasing sales with existing accounts. Thus, while Melcher was responsible for sales in the West Texas Territory, he was in regular conversation with Organogenesis representatives throughout Texas and Oklahoma about their accounts and client relationships.

41.     With the advice of his colleagues and under the tutelage of his supervisors, Melcher developed strong relationships with some of the largest medical practices in the West Texas Territory. His relationships bore fruit for Organogenesis, and he generated large, recurring orders from customers such as Dr. Timothy Bumann, a wound care and hyperbaric specialist in Abilene, Texas; Dr. Roger Wolcott, the medical director for multiple rehabilitation centers in the West Texas Territory; and Carenomics, a wound care unit located in Lubbock, Texas.

**Sales in Melcher's Territory Plummet**

42.     Melcher's territory was generally regarded as high performing. In fact, Melcher was so successful that Organogenesis recognized his outstanding performance with the Circle of Excellence award for top sales representative.

43.     In 2021, Melcher's accounts generated over $11.5 million in revenue. Much of Melcher's success was driven by a handful of large accounts: his top three accounts—Dr.

Bumann, Dr. Wolcott, and Carenomics— generated approximately $10.8 million of the $11.5 million in sales for 2021.

44.    However, the sales in Melcher's territory plummeted in 2022 and 2023. In 2022, Melcher's sales decreased by over 50% to $5.5 million, and, in 2023, his sales declined again by over 20% to $4.2 million.

45.    Dr. Wolcott, who serves as medical director for numerous medical centers, was the largest account in Melcher's territory. In 2021, Dr. Wolcott's account generated over $4.1 million in sales for Organogenesis. However, in 2022, Melcher's sales to Dr. Wolcott precipitously declined to approximately $1.9 million—a decrease of over 50% in a single year. In 2023, Melcher's sales to Dr. Wolcott plummeted again to just $881,450—a decrease of over 50% from the previous year and a decrease of nearly 80% from 2021.

46.    Dr. Bumann was also among Melcher's largest accounts, generating $2.9 million in sales for Organogenesis in 2021. Melcher's sales to Dr. Bumann also plunged, declining by more than 80% in 2022 to $562,500 and further declining to just $357,800 in 2023—a precipitous 87% drop from 2021.

47.    Between 2021 and 2023, Organogenesis lost approximately $7.3 million in sales in Melcher's West Texas Territory, which represents about $5.8 million in lost profits.

## Melcher Operates a Scheme to Sell Competitive
## Products to Organogenesis's Customers While Still Employed by the Company

48.    Unbeknownst to Organogenesis, as of January 2023, or perhaps earlier, Melcher was secretly siphoning off Organogenesis's customers for his own benefit and the benefit of the Company's direct competitors and misappropriating the Company's confidential information for his wrongful ends.

49.     Contemporaneous emails reveal that Melcher was surreptitiously working with Rogue Medical and Michelle Lerma, a former Organogenesis sales representative, to target Organogenesis's customers and divert them to the Company's competitors, including Tides Medical.

50.     While employed by Organogenesis, Melcher, on behalf of Rogue Medical—using an email address called "West Texas Biologics" (wtxbiologics@roguemedical.net)—solicited Dr. Bumann, one of Organogenesis's top customers in Melcher's territory, to enter into a sales relationship with Tides Medical, a direct competitor of the Company, and facilitated the sale of competitive products to Dr. Bumann.

51.     On information and belief, Melcher solicited multiple Organogenesis customers in the West Texas Territory and diverted millions in sales from Organogenesis to the Company's direct competitors.

52.     On January 23, 2023, Dr. Bumann copied Melcher's Organogenesis email address on correspondence with John Jarvis, Regional Sales Director for Tides Medical, a direct competitor of the Company. Ex. 2. In a January 5 message earlier in the chain, Jarvis emailed Michelle Lerma and Melcher at their Rogue Medical addresses and Dr. Bumann (copying other Tides Medical employees). In the email to Lerma, Jarvis wrote:

> I am working on getting you all the info that is being requested. I recommend setting up this account as Direct Purchase instead of Consignment, so that they can order on a monthly needs basis and receive 1 invoice for that month. We are more than willing to help make ordering as easy as possible. I will request the prepopulated Insurance Intake Form and DocuSign agreement be sent asap. Once I receive all the answers to your questions, I will forward them to you. **I appreciate your help and Russ' as well in signing up Dr. Buhmann [sic]. I always liked working with Dr. Buhmann [sic] when I was with Organo years ago**. One of my all-time favorite docs!

Ex. 2. (emphasis added).

53.     Dr. Bumann responded to Jarvis's email on January 23, 2023, indicating that he is interested in a "Direct Purchase Agreement" with Tides Medical, confirming his purchase price for Tides' Atracent products, and informing the group, including Melcher, that he plans to order Tides' product as soon as he has all necessary information and an agreement in place. *Id.* Tides' Atracent product directly competes with Organogenesis's products.

54.     On February 23, 2023, Jarvis of Tides Medical copied Melcher's Organogenesis email address on correspondence to Lerma with the subject "Dr. Bumann's VIP Agenda." Ex. 3. The email includes an attachment detailing the schedule for a visit by Dr. Bumann to Tides Medical's office and a meeting between Dr. Bumann and Tides' executives. *Id.*

55.     On April 27, 2023 Jarvis forwarded Melcher (at his Organogenesis email address), Lerma, and others an email detailing Tides Medical's "Selling Tips & New Resources." Ex. 4.

56.     On September 20, 2023, the office of Dr. Bumann sent an email to Melcher's Organogenesis email address with a question regarding Biovance, a third-party wound care product that directly competes with Organogenesis's products. Ex. 5.

57.     On October 2, 2023, Dr. Bumann copied Melcher's Organogenesis email address on correspondence with representatives from Tides Medical. Earlier in the email chain, Melcher, using his Rogue Medical email address, provides Dr. Bumann's Wound Care Billing Manager, Desirae Klozinski, with billing information on Tides' Atracent product and Biovance, and coordinates with Dr. Bumann's staff and a Tides' Field Reimbursement Manager regarding insurance reimbursement for Atracent and Biovance. Ex. 6.

58.     On or about October 10, 2023, Melcher approached Organogenesis's Vice President of Sales, Justin Larrick, and expressed an interest in resigning as a full-time employee of Organogenesis and, instead, working with the Company as an independent contractor in the West Texas Territory. Larrick informed Melcher that the Company is not in the practice of engaging independent contractors for its sales efforts and was not interested in doing so with Melcher.

59.     Around the same time, Melcher also raised the issue of becoming an independent contractor with Darren McBee, the Company's Senior Director of Sales for the West and Melcher's supervisor. Like Larrick, McBee told Melcher that the Company was not interested in such an arrangement.

60.     After Organogenesis's sales leadership unequivocally told Melcher in mid-October that the Company was not interested in transitioning to an independent contractor relationship, Melcher remained employed full-time with Organogenesis and continued to duplicitously operate as a sales agent for Rogue Medical, soliciting business for Organogenesis's competitors.

61.     On October 16, 2023, Jarvis of Tides Medical forwarded Melcher (at his Organogenesis email) and Lerma a message from Tides' Regional Vice President of Sales that provided Tides' "West Region" sales force with information on ordering Atracent and Helicoll grafts for customers in the region. Ex. 7. Helicoll is a bioactive skin substitute used for tissue regeneration in wound management, and, like Atracent, directly competes with Organogenesis's products. Jarvis wrote to Melcher and Lerma, "Please see John's message below about ordering grafts" and attached two documents detailing pricing for the Atracent and Helicoll products. *Id.*

62.     On or around November 2, 2023, Organogenesis sales leaders, including the Company's Vice President of Sales, Justin Larrick, attended the Symposium on Advanced Wound Care ("SAWC") in Las Vegas, Nevada. Organogenesis hosted an educational dinner for its current and prospective customers. Prior to the conference, Melcher had recommended to Larrick that the Company invite Dr. Bumann to its dinner given that he was a significant customer for the Company.

63.     At the SAWC dinner, Larrick spoke to Dr. Bumann. To Larrick's surprise, Dr. Bumann commented that it was "too bad" Melcher was no longer working for Organogenesis. When Larrick inquired further, Dr. Bumann expressed his belief that Melcher was no longer employed by the Company. Larrick informed Dr. Bumann that Melcher was still employed by Organogenesis. Larrick further relayed to Dr. Bumann that, while Melcher had inquired about an independent contractor relationship, the Company was not exploring that as an option for its sales representatives. Larrick then asked Dr. Bumann if Melcher was working as an independent contractor. Dr. Bumann grew uncomfortable, responded that he had not spoken with Melcher in a while, and ended the conversation.

64.     Melcher was not invited by Organogenesis to attend the SAWC Conference with the Company in November 2023. Yet, at least two senior Organogenesis employees saw Melcher at the conference with Michelle Lerma, current Vice President of Sales for Rogue Medical and a former Organogenesis employee.

65.     On information and belief, Melcher attended the SAWC Conference with Rogue Medical to opportunistically solicit Organogenesis's current and prospective customers for the Company's competitors.

66.     Melcher's targeting of his accounts at Organogenesis for his own benefit and for the benefit of Rogue Medical and Tides Medical reveals that Melcher has been misusing confidential information about Organogenesis's customers. On information and belief, Melcher has been misappropriating confidential information about Organogenesis's customer accounts, such as customer preferences, purchase histories and patterns, competitive product utilization, practice patterns (*e.g.*, how clinicians utilize skin substitutes), and purchase power (*e.g.*, credit limits and other limitations).

67.     On information and belief, Melcher has misappropriated this confidential information, including information regarding his former accounts and the accounts of his former colleagues at Organogenesis, who discussed their accounts with Melcher, while he was still at the Company and misused that confidential information to benefit himself and the Company's direct competitors all to the detriment of Organogenesis.

68.     On information and belief, Melcher has not only used Organogenesis's confidential information regarding its customers for his own benefit, but he has also shared that confidential information with Rogue Medical and Tides Medical.

## COUNT I

### Breach of Contract – Non- Compete and Non-Solicitation Clause

69.     Organogenesis re-alleges and incorporates each and every allegation made in the preceding paragraphs as if fully set forth herein.

70.     Melcher is subject to the validly formed Non-Compete Agreement. The Non-Compete Agreement prohibits Melcher during "the term of his . . . association with" Organogenesis and for "a period of two years thereafter" from, *inter alia*, "interfere[ing] with or entic[ing] away any customer . . . of the Company." Ex. 1, § 2. He is further prohibited from engaging as a "salesperson or employee of any other business, firm or corporation which is, or

16

by the action of [Melcher] would become, competitive with the Business of the Company"
during his employment and for two years thereafter. *Id.*

71.    While Melcher was still employed at Organogenesis, he sold wound care products
that are directly competitive to Organogenesis's products to Organogenesis's customers in his
territory for his own personal gain. Melcher also covertly assisted Rogue Medical and Tides
Medical in selling competitive wound care products to and developing ongoing relationships
with Organogenesis's customers.

72.    Melcher's actions have caused Organogenesis's customers to significantly reduce
their purchases from with Organogenesis.

73.    As a direct and proximate result of Melcher's breach of the Non-Compete,
Organogenesis has suffered and continues to suffer harm, including, without limitation, lost
revenue and profits.

## COUNT II
### Breach of Contract – Misuse of Confidential Information

74.    Organogenesis re-alleges and incorporates each and every allegation made in the
preceding paragraphs as if fully set forth herein.

75.    Melcher is subject to the validly formed Non-Compete Agreement. The Non-
Compete Agreement prohibits Melcher from, *inter alia*, "us[ing] directly or indirectly for [his]
own benefit, during the period of his . . . association with the Company, or any time thereafter,
any . . . trade secret or . . . confidential information" that belongs to Organogenesis. Ex. 1, § 6.
Confidential information includes, without limitation, "prospect or customer list[s]" and closely
guarded information about Organogenesis's customers and their purchase histories and
preferences. *Id.*

17

76.     During his employment, Melcher misused Organogenesis's confidential information, including, without limitation, customers' purchase histories and patterns, customer preferences, and strategies for gaining business from customers and prospective customers, for his own personal benefit and the benefit of the Company's competitors. He used confidential information on Organogenesis's customers to sell and attempt to sell wound care products that are competitive to Organogenesis's products to Organogenesis's existing and prospective customers.

77.     On information and belief, Melcher has also disclosed Organogenesis's confidential information, including, without limitation, customers' purchase histories and patterns, customers' preferences, and customer-specific sales strategies, to the Company's direct competitors, Rogue Medical and Tides Medical.

78.     As a direct and proximate result of Melcher's breach of the Non-Compete, Organogenesis has suffered and continues to suffer harm, including, without limitation, lost revenue and profits.

## COUNT III

### Misappropriation of Trade Secrets Under the
### Texas Uniform Trade Secrets Act (Tex. Civ. Prac. & Rem. Code § 134A)

79.     Organogenesis re-alleges and incorporates each and every allegation made in the preceding paragraphs as if fully set forth herein.

80.     Through his employment with Organogenesis, Melcher received access to Organogenesis's trade secrets, including, without limitation, customers' purchase histories and patterns, customers' preferences, strategies for gaining business from customers and prospective customers, and other forms of information that are not publicly available.

81.     Organogenesis has taken great efforts to keep this information secret. Organogenesis's efforts include but are not limited to restricting electronic access to such confidential information to employees that have a business reason to access the information and requiring employees with access to the information to sign non-disclosure agreements and restrictive covenants. Confidential information concerning the West Texas Territory covered by Melcher was only accessible to Melcher, his supervisors, and a few executives with responsibilities for overseeing the Company's sales organization.

82.     Melcher had a duty to maintain the secrecy of Organogenesis's confidential information both as an employee and fiduciary of the Company and as required by the Non-Compete Agreement.

83.     Organogenesis has expended significant time, expense, and resources developing and protecting information on its markets and customers. This information is highly valuable to Organogenesis and to its competitive advantage in the market.

84.     Organogenesis's confidential information, including, without limitation, customer purchase histories and patterns, customer preferences, and strategies for gaining business from customers and prospective customers, constitute trade secrets within the meaning of the Texas Uniform Trade Secrets Act (Tex. Civ. Prac. & Rem. Code § 134A).

85.     Organogenesis's trade secrets derive independent economic value from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information.

86.     Melcher misappropriated Organogenesis's trade secrets when he used those trade secrets to sell and attempt to sell competitive wound care products to Organogenesis's customers and prospective customers for his own personal gain.

19

87.    On information and belief, Melcher has also used and disclosed Organogenesis's confidential information for the benefit of Rogue Medical and Tides Medical, direct competitors of the Company.

88.    As a direct and proximate result of Melcher's misappropriation, Organogenesis has suffered and continues to substantial suffer harm, including but not limited to the significant loss of business and customers and loss of reputation and goodwill.

89.    Organogenesis is entitled to actual damages pursuant to Tex. Civ. Prac. & Rem. Code § 134A.004(a)—including but not limited to the lost profits caused by Melcher's misappropriation and unjust enrichment, including disgorgement of all compensation or other value that the Defendant received, in any form— in an amount exceeding $75,000 and to be proven at trial.

90.    Melcher's conduct was willful and/or malicious, entitling Organogenesis to exemplary damages and attorney's fees pursuant to Tex. Civ. Prac. & Rem. Code §§ 134A.004(b), 134A.005. Melcher knew that he owed duties of confidentiality to Organogenesis, but nonetheless misappropriated the Company's trade secrets while still employed by the Company.

### COUNT IV

**Misappropriation of Trade Secrets Under the
Defend Trade Secrets Act of 2016 (18 U.S.C. § 1836)**

91.    Organogenesis re-alleges and incorporates each and every allegation made in the preceding paragraphs as if fully set forth herein.

92.    Organogenesis is a Massachusetts-based company that sells its products through interstate commerce across the United States through sales representatives located in each of its sales territories.

93.     Through his employment with Organogenesis, Melcher received access to Organogenesis's trade secrets, including, without limitation, customers' purchase histories and patterns, customers' preferences, strategies for gaining business from customers and prospective customers, and other forms of information that are not publicly available.

94.     Organogenesis has taken great efforts to keep this information secret. Organogenesis's efforts include but are not limited to restricting access to such confidential information to its employees that have a business reason to access the information and requiring employees with access to the information to sign non-disclosure agreements and restrictive covenants. Confidential information concerning the West Texas Territory covered by Melcher was only accessible to Melcher, his supervisors, and a few executives with responsibilities for overseeing the Company's sales organization.

95.     Melcher had a duty to maintain the secrecy of Organogenesis's confidential information both as an employee and fiduciary of the Company and as required by the Non-Compete Agreement.

96.     Organogenesis has expended significant time, expense, and resources developing and protecting information on its customers. This information is highly valuable to Organogenesis and to its competitive advantage in the market.

97.     Organogenesis's confidential information, including, without limitation, customer purchase histories and patterns, customer preferences, and strategies for gaining business from customers and prospective customers, constitute trade secrets within the meaning of the Defend Trade Secrets Act (18 U.S.C. § 1839(3).

98.     Organogenesis's trade secrets derive independent economic value from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information.

99.     Melcher misappropriated Organogenesis's trade secrets when he used those trade secrets to sell and attempt to sell competitive wound care products to Organogenesis's customers and prospective customers for his own personal gain.

100.     On information and belief, Melcher has also used and disclosed Organogenesis's confidential information for the benefit of Rogue Medical and Tides Medical, direct competitors of the Company.

101.     As a direct and proximate result of Melcher's misappropriation, Organogenesis has suffered and continues to suffer substantial harm, including but not limited to the significant loss of business and customers and loss of reputation and goodwill.

102.     Organogenesis is entitled to actual damages pursuant to 18 U.S.C. § 1836(b)(3)(B)—including but not limited to the lost profits caused by Melcher's misappropriation and unjust enrichment, including disgorgement of all compensation or other value that the Defendant received, in any form— in an amount exceeding $75,000 and to be proven at trial.

103.     Melcher's conduct was willful and/or malicious, entitling Organogenesis to exemplary damages and attorney's fees pursuant to 18 U.S.C. §1836(b)(3)(C) and (D). Melcher knew that he owed duties of confidentiality to Organogenesis, but nonetheless misappropriated the Company's trade secrets while still employed by the Company.

## COUNT V

## Tortious Interference with Business Relations

104.    Organogenesis re-alleges and incorporates each and every allegation made in the preceding paragraphs as if fully set forth herein.

105.    Organogenesis has long-standing and significant business relationships with its existing customers in the West Texas Territory, including, without limitation, Dr. Bumann and Dr. Wolcott, and with prospective customers in the same territory. These relationships include customers who would make multiple, repeat purchases of wound care products from Organogenesis, and as such, were likely to be very profitable for Organogenesis.

106.    On information and belief, Melcher, acting on behalf of himself, Rogue Medial and Tides Medical, willfully and intentionally interfered with Organogenesis's existing and prospective business relationships in the West Texas Territory through improper motive or means by soliciting Organogenesis's customers in the West Texas Territory to cease their business with Organogenesis and move their business to Organogenesis's competitors, including Rogue Medical and Tides Medical, while he was employed by the Company and in violation of his contractual and fiduciary obligations. On information and belief, Melcher also used Organogenesis's confidential information to pursue Organogenesis's customers and lure them away from Organogenesis.

107.    On information and belief, Melcher has also used Organogenesis's confidential information to assist the Company's competitors Rogue Medical and Tides Medical in selling wound care products to Organogenesis's existing and prospective customers.

108.    As a direct and proximate result of Melcher's conduct, Organogenesis has suffered and continues to suffer damages in form of lost revenues from ongoing and future

business with existing and prospective customers of more than $75,000 and in an amount to be proven at trial.

## COUNT VI
### Breach of Duty of Loyalty

109.    Organogenesis re-alleges and incorporates each and every allegation made in the preceding paragraphs as if fully set forth herein.

110.    While still employed at Organogenesis, Melcher had a duty of loyalty to act primarily for the benefit of Organogenesis in all matters related to their employment.

111.    While still employed by Organogenesis, Melcher had a duty of loyalty not to misappropriate Organogenesis's confidential information, including, without limitation, customer purchase histories and patterns, customer preferences, and strategies for gaining business from customers and prospective customers.

112.    While still employed by Organogenesis, Melcher had a duty of loyalty not to solicit Organogenesis's customers.

113.    During his employment with Organogenesis, Melcher used substantial time, resources, and efforts to solicit Organogenesis's customers and sell competitive products for the benefit of himself and the Company's competitors and to develop relationships between the Company's customers and its competitors.

114.    On information and belief, during his employment, Melcher misused Organogenesis's confidential information, including, without limitation, customer purchase histories and patterns, customer preferences, and strategies for gaining business from customers and prospective customers, for his own personal benefit and the benefit of the Company's competitors. He used confidential information regarding Organogenesis's customers to sell and

24

attempt to sell wound care products that are competitive to Organogenesis's products to the Company's existing and prospective customers.

115.    As a direct and proximate result of Melcher's conduct, Organogenesis has suffered actual damages of more than $75,000 and in an amount to be proven at trial.

## REQUEST FOR RELIEF

WHEREFORE, Plaintiff Organogenesis respectfully requests that this Court grant the following relief:

A.  Enter judgment for Organogenesis against Defendant on all counts of this Complaint;

B.  Award Organogenesis compensatory and exemplary damages in an amount to be determined at trial;

C.  Permanently enjoin Defendant from using Organogenesis's confidential information and trade secrets;

D.  Enjoin Defendant from violating the non-solicitation and non-compete provisions of the Non-Compete;

E.  Toll the enforcement period of the Non-Compete for the period that Defendant was not in compliance with the non-solicitation and non-compete provision of the Non-Compete; and

F.  Award Organogenesis's attorneys' fees, costs, and expenses in this action; and

G.  Grant any such other and additional relief that the Court deems just and proper.

## JURY DEMAND

Plaintiff Organogenesis demands a trial by jury on all claims so triable.

Dated:  January 5, 2024                    Respectfully submitted by,

                                           ORGANOGENESIS INC.,

                                           By and through its attorneys,

                                           */s/ Richard Biggs*
                                           Richard Biggs
                                           Mullin Hoard & Brown, LLP
                                           500 S Taylor, Suite 800, LB 213
                                           Amarillo, TX 9101
                                           Texas Bar No. 24064899
                                           rbiggs@mhba.com
                                           Tel: 806-372-5050
                                           Fax: 806-372-5086


                                           Michael Rosen
                                           Massachusetts Bar No. 559954
                                           Leah S. Rizkallah
                                           Massachusetts Bar No. 696949
                                           FOLEY HOAG LLP
                                           155 Seaport Boulevard
                                           Boston, MA 02210-2600
                                           mrosen@foleyhoag.com
                                           lrizkallah@foleyhoag.com
                                           Tel: 617-832-1000
                                           Fax: 617-832-7000